IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In the Matter of: | ) | Case No. 25-81134-BSK |
| | ) | |
| EAD CONSTRUCTORS, INC. | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**Findings and Conclusions for Temporary Allowance of Claim No. 14 for Plan Voting Purposes**

PURAC America, Inc. d/b/a Corbion filed a motion to allow its claim for purposes of accepting or rejecting the debtor's Chapter 11 plan. Lauren Goodman appeared for the debtor EAD Constructors, Inc. Sam King appeared for Corbion. Corbion's motion is granted in part. Corbion's claim is allowed, solely for voting purposes under Bankruptcy Rule 3018(a), in the amount of $2,390,840.[1]

Corbion requests to vote its claim in the filed amount of $40,781,928. The record does not support allowance of the entire claim. The claim includes $13,088,936 for contingent indemnity against subcontractor liens Corbion itself disputes, implicating 11 U.S.C. § 502(e)(1)(B). It includes $2,026,853 in attorneys', expert, and arbitration fees the record does not support. It includes $19,932,000 in liquidated damages, computed through a forecast completion date assuming a December 2025 arbitration award. On Corbion's theory, they continue to accrue. And the claim includes damages not established on this record.

Likewise, the record does not support the debtor's request to allow the claim at $0 or some nominal amount. The debtor's own experts calculate Corbion's gross damages at $7,970,383 and net damages at $1,175,651 after the unpaid contract value is applied. The debtor reaches zero only by further netting its own disputed and unliquidated counterclaim.

[1] The debtor and Corbion are arbitrating Corbion's claim. On March 5, 2026, Corbion was granted relief from the automatic stay to continue the arbitration.

## Jurisdiction

This court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (L). Venue is proper under 28 U.S.C. § 1409. To the extent any matter determined is non-core, the temporary and non-preclusive character of this order makes final adjudication unnecessary.

## Legal Standard

"The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." 11 U.S.C. § 1126(a). A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." *Id*. § 502(a). "Even if an objection to a claim or interest has been filed, the court may, after notice and a hearing, temporarily allow a claim or interest in an amount that the court considers proper for voting to accept or reject a plan." Fed. R. Bankr. P. 3018(a)(4).

The inquiry is summary. It is not allowance under 11 U.S.C. § 502(b) and not an adjudication of the merits. Temporary allowance is discretionary. It guards against plan proponents who might ensure acceptance of a plan by last-minute objections. *Armstrong v. Rushton (In re Armstrong)*, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003). It also keeps an unliquidated claim from controlling a vote it cannot yet justify. *Bell Road Inv. Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211 (B.A.P. 9th Cir. 1989); *In re Goldstein*, 114 B.R. 430 (Bankr. E.D. Pa. 1990).

A proof of claim filed under the rules is prima facie evidence of the claim's validity and amount. Fed. R. Bankr. P. 3001(f). An objector must come forward with substantial evidence. *McDaniel v. Riverside Cnty. Dep't of Child Support Servs. (In re McDaniel)*, 264 B.R. 531, 533 (B.A.P. 8th Cir. 2001). The claimant bears the burden of proof once the claim is rebutted. *Gran v. IRS (In re Gran)*, 964 F.2d 822, 827 (8th Cir. 1992). Courts apply the same allocation under Bankruptcy Rule 3018(a). *See Armstrong*, 294 B.R. at 354.

The parties dispute the method for temporary allowance. The debtor relies on *Bittner v. Borne Chem. Co.*, 691 F.2d 134 (3d Cir. 1982), which held estimating a disputed claim at zero was not an abuse of discretion. Corbion urges the probability-weighted approach of *In re Windsor Plumbing Supply Co.*, 170 B.R. 503 (Bankr. E.D.N.Y. 1994), and *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996). Either is within the court's discretion. *In re Chemtura Corp.*, 448 B.R. 635, 648–49 (Bankr.

S.D.N.Y. 2011). Neither fits this record. An all-or-nothing estimate requires the court decide the central question in the arbitration: which party breached first. And it must do so solely on a written evidentiary record. A probability-weighted estimate requires probabilities. Neither party offered any. Instead, Corbion generically asserts a "high probability" of success. Corbion does not quantify it.

Corbion's claim has several components. This order determines each component largely based on the contract, the undisputed facts, or the debtor's own evidence. Where a component cannot be determined on this record, it is excluded. In one component, the cost to correct defective work, the debtor's expert's figure is partly provisional. The figure Corbion's expert offered is used after removing the one item the record does not resolve. The result is conservative. It discounts Corbion's claim without requiring the court invent a probability, and it gives Corbion a vote measured largely by what the debtor's own evidence supports.

The evidence primarily consists of portions of the parties' contract and portions of the expert reports the parties obtained for their pending arbitration. The record does not include live witness testimony or significant deposition testimony. The debtor's expert evidence rebuts the presumption of validity on each contested component, so Corbion bears the ultimate burden.[2] But the debtor's own evidence also sets a floor its objection cannot go below.

**Findings and Conclusions**

The debtor contracted with Corbion to expand Corbion's lactic acid facility in Blair, Nebraska.[3] The written agreement provides for the full engineering, procurement, and construction of the project, and the agreement is titled Engineering, Procurement and Construction Agreement (the "EPC Agreement"). For the engineering component the debtor hired a related entity, EAD Engineering.

---

[2] Corbion contends the debtor's objection lacks the "specific grounds" required by Neb. R. Bankr. P. 3007-1(B). The rule governs the debtor's objection to Corbion's claim, which is not before the court. For the temporary valuation of Corbion's claim, the debtor's expert reports supply specific grounds.

[3] Proof of Claim 14-1. All contract terms, including those under the EPC Agreement and the GMP Amendment, are in documents attached to Corbion's proof of claim.

Compensation for the project is on a cost of the work plus fee basis subject to a guaranteed maximum price. The contractor's fee is 4.00%. Savings are shared 75% to Corbion and 25% to the debtor. Under the GMP Amendment executed March 11, 2022, the parties fixed a guaranteed maximum price of $34,228,106, including a contingency of $2,605,832. Approved changes reduced the total to $34,126,620.

The GMP Amendment contains two milestones, which, if not met, impose liquidated damages:

| **Milestone** | **Required Date** | **Rate** | **Grace** |
|---|---|---|---|
| Partial Completion | January 16, 2023 | $1,000/day | 21 days |
| Substantial Completion | April 24, 2023 | $15,000/day | 28 days |

Articles III.C and III.D of the EPC Agreement provide that liquidated damages "shall substitute for any other damages . . . due only to the delay."

The debtor did not achieve either milestone.[4] On or about July 5, 2023, a city building inspector determined the debtor had not obtained a structural building permit.[5] The debtor stopped working and demobilized on July 14, 2023.[6] The project has not been completed. Corbion has not hired a replacement contractor to complete the project.[7] To date Corbion has paid the debtor $27,331,888.[8] Subcontractors filed construction liens against the property. The liens are the subject of litigation in Nebraska state court.[9]

Corbion filed Claim No. 14 in the amount of $40,781,928. The claim has three primary components: $25,666,139 in net liquidated and other damages, $2,026,853 in attorneys', expert, and arbitration fees, and $13,088,936 for Corbion's contingent indemnity for unpaid subcontractor liens.[10]

---

[4] Doc. #67-9, § 1; Doc. #212-6, Tables 13-14; Doc. #214, ¶ 6.

[5] Doc. #212-2, § 7.1; Doc. #67-8, § VI(B)(1).

[6] Doc. #212-6, § 4.1; Doc. #67-9, § 4.4; Doc. #214-1, Att. B.

[7] Doc. #67-9, § 1; Doc. #212-2, Summary; Doc. #212-6, n.82.

[8] Doc. #67-9, § 5.4; Doc. #212-3, Sch. A; Doc. #212-4, Note 5.

[9] Doc. #67-9, § 1; Doc. #131.

[10] Proof of Claim 14-1; Doc. #202, ¶ 25.

The parties offered reports from five teams of experts.[11] Corbion's experts are HKA Global, which opines as to delay and cost, and The Vertex Companies, which opines as to defects. The debtor's experts are Delta Consulting as to delay, Arup as to defects, and Capital Project Management, Inc. ("CPMI") as to damages. Because the experts did not testify, credibility determinations are neither made nor intended.

The debtor summarized its calculation of Corbion's claim in a one-page comparison chart labeled "Exhibit G."[12] From the debtor's perspective, Exhibit G computes Corbion's claim at negative $2,096,026. Exhibit G's structure is sound. This order follows it:

| **Comparison of Corbion's Damages** | | |
|---|---|---|
| **Category of Damages** | **Corbion's Position** | **Debtor's Position** |
| Liquidated Damages | $19,932,000 | $2,380,000 |
| Costs Incurred to Continue Construction Scope | $756,876 | $620,191 |
| Costs To-Go to Complete Construction Scope | $7,088,034 | $4,632,302 |
| Remediation / Deficiencies | $4,683,961 | $337,890 |
| Less: Unpaid Unapproved Change Orders | $0 | ($3,271,677) |
| Less: Unpaid Contract Value | ($6,794,732) | ($6,794,732) |
| **Corbion's Total Damages** | **$25,666,139** | **($2,096,026)** |

The debtor reaches a negative number by subtracting $3,271,677 in unapproved change orders. Without the subtraction, the debtor's own experts'

[11] Doc. #67-8; Doc. #67-9; Doc. #212-1 to -6; Doc. #214-1; Doc. #214-2. Both the debtor and Corbion expressly limited the purposes for which their reports were offered. The debtor's reports are offered "solely for the purpose of showing the Court that Corbion's claim . . . should be estimated at $0," with privilege reserved. Doc. #212, ¶ 5. Corbion's reports are similarly limited. Doc. #214, ¶ 4. Some expert source data was withheld as voluminous but is "available upon the Court's request." Doc. #212, ¶ 3. Corbion also offered to submit under seal the "Owner's Project Criteria and Basis of Design," an exhibit to the EPC Agreement not attached to its proof of claim.

[12] Doc. #212, ¶ 4; Doc. #212-7, Ex. G.

figures yield net damages of $1,175,651.[13] Therefore, the debtor's $0 figure rests entirely on netting.

*Liquidated Damages*

The contract documents expressly provide for liquidated damages. All but one input is fixed by the EPC Agreement and the GMP Amendment. These documents set the daily rates, the grace periods, and the required completion dates. The total days are not set and are heavily contested. The record contains five plausible results:

| **Basis** | **Days (Partial / Substantial)** | **Amount** |
|---|---|---|
| 1. Accrued as of July 14, 2023, stoppage[14] | 179 / 81 | $953,000 |
| 2. The debtor's state court pleading[15] | Not stated | $1,440,000 |
| 3. Delta's analysis assuming the debtor is not responsible for leaving the site[16] | 241 / 172 | $2,380,000 |
| 4. Delta's analysis assuming the debtor is responsible for leaving the site[17] | 253 / 184 | $2,572,000 |
| 5. The debtor's June 26, 2023, schedule update[18] | 282 / 213 | $3,036,000 |

The debtor's own figure, $2,380,000, is adopted.[19] The debtor's brief describes it as the liquidated damages "attributable to the Debtor" if the debtor was not

---

[13] Gross damages of $7,970,383, minus $6,794,732 equals $1,175,651.

[14] Doc. #214-1, Att. B & n.35.

[15] *Id.*, § 4.2.1.1.

[16] Doc. #212-4, Opinion 1 & Sch. A, Note 1.

[17] *Id.* Responsibility for leaving the site accounts for 12 days. *Id.*, Opinions and Conclusions 1.

[18] Doc. #67-9, § 1; Doc. #214-1, Att. B & n.35.

[19] HKA Global, on behalf of Corbion, describes $3,036,000, derived from the debtor's June 26, 2023, schedule update, as "a minimum." Doc. #214-1, Att. B. The $656,000 difference between that figure and the amount adopted is the 41-day postponement of power forward, about which the facts are disputed. ($3,036,000 − $2,380,000 = 41 × ($1,000 + $15,000)). Arup and Delta blame Corbion for the delay. Doc. #212-2, § 7.2.1; Doc. #212-6, § 4.1.2. Vertex blames the debtor. Doc. #214-2, § V.A.8. Worden, the project's structural engineer of record, was equivocal. Doc. #229, Ex. A, Worden Dep.

responsible for the demobilization. It is Delta's analysis as priced by CPMI, and it is the amount the debtor carries in Exhibit G. It does not require resolution of disputes over methodology. And it does not require resolution of who bears responsibility for the period after the debtor left the job site.

The debtor contends Corbion may recover only if the debtor did not breach first. *See Weber v. N. Loup River Pub. Power & Irr. Dist.*, 854 N.W.2d 263, 273 (Neb. 2014) (holding that, generally, a party who failed or refused to perform contract terms "cannot recover for a breach thereof by the other party"). But its damages expert does not apply the limitation.[20] CPMI calculates $2,380,000 and assumes the debtor was not responsible for leaving the site. The debtor's own experts, in their written reports, charge this delay to the debtor even if Corbion's non-payment justified demobilization. Whether any breach by Corbion excused the debtor's further performance is a question for the arbitration panel. The amount adopted does not depend on the answer.

The bases for liquidated damages in Rows 1 ($953,000) and 2 ($1,440,000) of the above chart are not adopted. Row 1 stops the count on the day the debtor left the site, even though the debtor's own delay expert charges the debtor with delay through the forecast completion date. Row 2 is a figure the debtor used in a state court pleading, and it does not state a count of days.

Corbion's expert, HKA Global, calculates liquidated damages of $19,932,000 using a forecast completion date assuming an arbitration award in December 2025, a date expressly "subject to change."[21] The chosen date passed without an award. The final hearing is now set for March 8, 2027. On this reasoning, the damages grow until the project is completed after the arbitration.

Corbion's approach cannot be sanctioned on this record. Corbion offered no evidence fixing when completion reasonably should have occurred. Corbion did offer some evidence explaining why the period was protracted: the project was "red-tagged" and EAD Engineering refused to address the outstanding

---

94:24–95:2, 92:14–18 (testifying fire protection issues had to be addressed before power forward but also that he "could have satisfied" the building inspector). The contested portion is left for the arbitration panel.

[20] Doc. #212-4, Note 1.

[21] Doc. #67-9, § 1 & n.71; Doc. #212-4, Note 1.

issues.[22] But the explanation itself is disputed and unquantified. Arup's report states temporary structural permitting, valid through September 2023, was "promptly obtained."[23] Corbion offered no evidence of whether and when the red tag was lifted. It did not describe meaningful efforts to engage a replacement engineer of record. Instead, it "chose to wait" given various uncertainties.[24]

The debtor asserts "Corbion's liquidated-damages figure is unenforceable as a penalty" and argues Corbion does not account for mitigation, citing *Browning Ferris Indus. of Neb., Inc. v. Eating Establishment-90th & Fort, Inc.*, 575 N.W.2d 885, 888–91 (Neb. Ct. App. 1998). They challenge accrual running years past any reasonable completion date. These arguments are directed at Corbion's $19,932,000 figure. The amount adopted ends at Delta's forecast completion date of December 5, 2023, and includes only delay the debtor's own experts charge to the debtor. Corbion responds that no duty to mitigate arises where a liquidated damages clause is enforceable, citing *Aramark Unif. Servs. v. Meylan Enters., Inc.*, 2007 WL 1532329, at *6 (Neb. Ct. App. May 29, 2007). Neither side's arguments are decided.

*Costs Incurred to Continue Scope*

For damages for the costs to continue the debtor's scope of work, Corbion's expert states $756,876; the debtor's $620,191.[25] This element of damage should largely be a question of fact, not opinion. The element consists of funds expended. It does not require estimation. Invoices should exist. Corbion, which bears the burden, did not offer them into evidence. Therefore, $620,191, the amount asserted by the debtor, is adopted.

*Costs to Complete*

For damages to complete the project, Corbion's expert states $7,088,034; the debtor's $4,632,302.[26] The debtor's lower figure rests, in part, on escalating costs to August 2023 rather than March 2025.[27] The debtor chose its endpoint

---

[22] Doc. #228, ¶ 6.

[23] Doc. #212-2, § 7.1.

[24] Doc. #67-9, § 4.4.

[25] *Id.*, § 5.2 & Att. B; Doc. #212-4, Opinions & Note 2.

[26] Doc. #67-9, § 5.3 & Att. B; Doc. #212-4, Opinions & Note 3.

[27] Doc. #212-4, Note 3; Doc. #212-6, § 6.3.1, ¶¶ 150, 157.

based on the premise that Corbion should have immediately continued the project. Corbion escalated to March 2025 because it was "the most recent data available."[28] The debtor's number is adopted, but not its underlying premise.

As noted, Articles III.C and III.D make liquidated damages substitute for damages "due only to the delay." Cost escalation attributable to the passage of time is damage due only to the delay. The debtor's figure excludes the escalation after August 2023. Corbion has not addressed Articles III.C and III.D. The debtor's figure is adopted without further reduction.

*Cost to Correct Defective Work*

For costs to correct allegedly defective work, Corbion's expert states $4,683,961; the debtor's $337,890.[29] Neither figure is adopted.

The debtor's expert, Arup, calculates its figure by reclassifying several alleged deficiency items as unfinished contract work, owner-directed changes, or items it could not evaluate.[30] Arup places $161,928 in a category of items with insufficient information for a complete assessment "at this time," and the debtor's damages expert states those amounts "will be adjusted."[31] Arup's number is expressly not final and cannot be adopted as a valuation.

Corbion relies on Vertex, which calculates $4,683,961.[32] Vertex starts with four line items of direct costs totaling $2,878,800, and a fifth, scaffolding, charged at 7.42% of items 1 through 4. Vertex adds a fixed contractor-supervision allowance of $193,200 (42 weeks at $4,600) and grosses up the result with successive markups for general conditions at 8.00%, overhead and profit at 10.00%, and contingency at 20.00%.

Line item 1 charges the debtor $2,044,485 for "structural permit issues." The item does not include permit fees. It consists of items such as engineer-of-record review and redesign ($1,093,964), weld and bolt testing ($197,730), and structural steel inspection forms ($752,791), which Vertex ties to

---

[28] Doc. #67-9, § 5.3.1.1; Doc. #212-4, Note 3.

[29] Doc. #67-9, § 1 & Att. B; Doc. #212-4, Opinions.

[30] Doc. #212-2, § 9.1.5; Doc. #212-6, § 4.5.

[31] Doc. #212-2, § 9.1.5 & Table 1; Doc. #212-4 at 4 n.5 & Note 4.C.

[32] Doc. #67-8, § VIII(A)(5) & App. III.

replacing the engineer of record after the debtor left and to satisfying building-permit requirements.[33] Vertex relies on GC-6(a) of the EPC Agreement: "All permits and licenses shall be secured and paid for by Contractor, unless otherwise specified, and shall be reimbursed by Owner as a Cost of Work. . . ."[34] But GC-3.3.7 of the same agreement may otherwise specify. It provides "Owner is responsible for obtaining and maintaining all permits applicable for the Project. . . ." Neither party's expert addressed both provisions. It is not clear how a permit clause covers redesign and testing. Whether these costs are the owner's permitting costs or the cost of correcting the debtor's structural work cannot be resolved on this record. Because this item cannot be resolved, Vertex's number is adopted after deducting it.

Without line item 1, the first four line items total $834,315. Scaffolding becomes $61,906 for a subtotal of $896,221. Adding Vertex's $193,200 supervision allowance and applying its general conditions, overhead and profit, and contingency markups results in $1,553,079.[35]

*Attorneys', Expert, and Arbitration Fees*

No attorneys' fees, expert fees, or arbitration fees are determined or allowed. Corbion claims $1,567,896 in arbitration attorneys' and expert fees, $330,187 in fees defending the lien foreclosure action, and $128,770 in American Arbitration Association filing and arbitrator fees. The record does not include an invoice, a fee itemization, or a single time record. No declaration addresses reasonableness. The evidence on this record does not allow the amount to be fixed. Temporary allowance requires an amount. *See* Fed. R. Bankr. P. 3018(a)(4).[36]

---

[33] Doc. #67-8, § VI(B)(1), at 48-49; § VII, at 74–75; App. III, at 136-37.

[34] *Id.*, § VI(B)(1), at 48.

[35] *Id.* at 136, 154. The debtor disputes several markups and the amounts. Experts on both sides address them.

[36] The debtor also contends GC-24(b) reaches fees only if the underlying breach is established, GC-24(c) excludes loss caused by Corbion's own fault, and Nebraska law does not permit recovery of attorneys' fees under a contractual indemnity provision. *See Havelock Bank of Lincoln v. W. Sur. Co.*, 352 N.W.2d 855, 859 (Neb. 1984). Corbion responds the arguments were untimely and argues Nebraska law permits an indemnitee to recover fees incurred defending claims within the indemnity. *See Select Food Mart Inc. v. Abeesha, Inc.*, 2020 WL 6514337 (D. Neb. Nov. 5, 2020). Neither the arguments nor the response is reached.

*Contingent Indemnity for Subcontractor Liens*

No amount is allowed for Corbion's claim of $13,088,936 for indemnification for subcontractor liens. The lien claims have not been paid. Corbion itself disputes them. Again, temporary allowance requires an amount. The court cannot supply one for a wholly contingent claim which no expert valued and which may be subject to mandatory disallowance under 11 U.S.C. § 502(e)(1)(B).[37]

Corbion argues a contingent claim should be discounted by the probability that the contingency will occur rather than estimated at zero. *See In re FV Steel & Wire Co.*, 372 B.R. 446, 454 (Bankr. E.D. Wis. 2007). The principle is sound. But applying it requires evidence of probability. Corbion offered none. The provision Corbion relies on, GC-24(b).2 of the EPC Agreement, excepts liens "due to Owner's wrongful failure to pay Contractor." The contingency turns on the payment question the parties are arbitrating.

The debtor entered a stipulation with five subcontractors, fixing their claims against the debtor at a total of $7,063,427.[38] This stipulation does not establish Corbion's liability. Including the amounts in the indemnity component would allow the same debt twice for voting purposes. The subcontractors may vote them.

*Unpaid Contract Value*

The parties do not dispute the unpaid contract value. It is $6,794,732, calculated as the difference between the adjusted guaranteed maximum price of $34,126,620 and payments of $27,331,888.[39]

*Unapproved Change Orders*

In Exhibit G, the debtor reduces Corbion's claim by $3,271,677 for 165 items the debtor classifies as change orders Corbion has not approved.[40] The

---

[37] The court expressly reserves, for purposes of allowance, whether § 502(e)(1)(B) requires disallowance and the extent to which the indemnity claim duplicates the subcontractors' claims.

[38] Doc. #131.

[39] Doc. #67-9, § 5.4; Doc. #212-4, Note 5.

[40] Doc. #212-3, Opinions & Sch. A; Doc. #212-5, §§ 2.1 & 4.4; Doc. #212-7, Ex. G.

amount comes from a spreadsheet the debtor prepared.[41] Its experts rely upon it.[42] The spreadsheet is not a log of change orders. It tracks every cost the debtor incurred over budget: 464 items totaling $8,937,565.[43] The debtor classified the 165 items, totaling $3,271,677, as “change order entitlement.”[44] The amount of the change order claim has not been stable. In July 2023 the debtor listed more than 200 items totaling more than $4,500,000.[45] And at least four versions of the spreadsheet exist.[46]

Only a few requests went through the formal change order process stated in the contract.[47] The parties dispute why. The debtor contends Corbion directed it to give notice of changes rather than submit change orders.[48] Corbion contends most requests were not submitted until June 2023, shortly before the debtor left the site, and were waived because the debtor did not make written requests as required.[49] No expert for the debtor values the requests individually or addresses notice. CPMI takes the amounts from the spreadsheet and disclaims entitlement and technical evaluation.[50] Delta

---

[41] In its brief the debtor calls the spreadsheet a “contemporaneous project record cataloguing every variance and change event,” but two versions are dated June 2025. Doc. #214-2, § IV. And one of the columns is titled “EAD Themes for Arbitration.” Doc. #242, Ex. A, Col. C.

[42] Doc. #242, ¶ 3 & Ex. A; Doc. #212-3, Note 2 & n.6 (CPMI); Doc. #212-5, ¶ 42 & n.31 (Delta); Doc. #212-1, § 4 (Arup).

[43] Doc. #242, Ex. A, Cell L504.

[44] *Id.*, Ex. A, Cell L529. Delta uses the 165 / 299 division, and 16 causal categories corresponding to the spreadsheet’s “themes.” Doc. #212-5, ¶¶ 42–44 & n.32.

[45] Doc. #67-1 at 9.

[46] Doc. #214-2, § IV (noting versions dated May 31, 2023; July 17–20, 2023; June 26, 2025; and June 30, 2025).

[47] The spreadsheet contains a status for 11 of the 165 requests: five submitted, four rejected, and two approved, one of which is a $105,048 credit to Corbion. Doc. #242, Ex. A, Col. AG.

[48] Doc. #212-5, § 4.3, ¶¶ 38–41.

[49] Doc. #214, ¶ 7; Doc. #214-2, § IV.A; Doc. #228, ¶ 11.

[50] Doc. #212-3, Scope; Doc. #212-4, Scope.

opines on entitlement by category but disclaims amount.[51] Arup opines on scope and entitlement but disclaims value and "the method of notification."[52]

Finally, the debtor already billed part of the change order claim to the project contingency, which is part of the guaranteed maximum price. The spreadsheet shows $1,256,611 of the 165 requests billed against the contingency.[53] Corbion paid $811,892 of those billings.[54] The remaining $444,719 is part of the unpaid contract value already credited to the debtor. It appears netting the full $3,271,677 would credit the debtor a second time for $1,256,611 it has already been paid or credited.

The change order claim is therefore disputed as to entitlement, notice, and amount, and $1,256,611 of it has already been paid or credited. It is also the estate's own affirmative claim, preserved by the debtor's plan as the "Corbion Project Litigation," asserted as part of the debtor's construction lien at $8,245,755, and valued in the plan's liquidation analysis as part of a total claim against Corbion for up to $11,000,000.[55] Netting it against Corbion's claim would require adjudication of the estate's affirmative case in the debtor's favor at a summary hearing on temporary allowance of a creditor's claim. The court declines.

Other reasons support declining to net. This order treats the debtor's evidence as an admission countering its position that Corbion's claim should be set at $0. Netting would use the debtor's evidence in the debtor's favor to establish its own claim. And netting in this manner is effectively recoupment. "Recoupment allows a defendant to deduct its claim from the amount the plaintiff could otherwise recover if the claim arises out of the same transaction or subject matter on which the plaintiff sued." *Terry v. Standard Ins. Co. (In re Terry)*, 687 F.3d 961, 963 (8th Cir. 2012). Recoupment is an affirmative defense, and "[t]he burden of proof on matters raised in use of recoupment, is on the [party] who raises them." *Universal Pontiac-Buick-GMC Truck, Inc. v. Routson (In re Routson)*, 160 B.R. 595, 612 (Bankr. D. Minn. 1993). The debtor has not carried its burden on this record. Also,

---

[51] Doc. #212-5, § 1.2.

[52] Doc. #212-1, Executive Summary.

[53] Doc. #242, Ex. A, Cells M529 to P529.

[54] *Id.*, Ex. A, Cell M529.

[55] Doc. #67-9, n.9; Doc. #208-3, Ex. 3.

netting requires an amount, which the court declines to determine in this summary proceeding.

*Final Calculation*

Applying the foregoing:

| **Component** | **Amount** |
|---|---|
| Liquidated Damages | $2,380,000 |
| Costs Incurred to Continue Scope | $620,191 |
| Costs to Complete | $4,632,302 |
| Cost to Correct Defective Work | $1,553,079 |
| Attorneys', Expert, and Arbitration Fees | $0 |
| Contingent Indemnity | $0 |
| Unpaid Contract Value | ($6,794,732) |
| **Corbion's Total Damages** | **$2,390,840** |

This calculation departs from the debtor's Exhibit G in two respects: the cost to correct defective work and the netting of the debtor's unapproved change orders.

**Conclusion**

Claim No. 14 of PURAC America, Inc. d/b/a Corbion is temporarily allowed in the amount of $2,390,840 solely for the purpose of accepting or rejecting the debtor's plan under Bankruptcy Rule 3018(a). This order does not allow or disallow the claim under 11 U.S.C. § 502(b). Its findings are not preclusive and are not binding on any arbitration panel, any state court, or this court for purposes of final allowance.

Dated: October 13, 2026

BY THE COURT:

/s/ Brian S. Kruse
Brian S. Kruse
Chief Bankruptcy Judge